## UNITED STATES v. ARONIN.

District Court, S. D. New York.
Sept. 28, 1944.

James B. M. McNally, U.S. Atty., and Florence P. Shientag, Asst. U. S. Atty., both of New York City, and Abraham Glasser, Sp. Appellate Atty., Office of Price Administration, of Washington, D. C., for plaintiff.

Poses, Katcher & Driesen, of New York City (Samuel Poses and Harry Stein, both of New York City, of counsel), for defendant.

LEAMY, District Judge.

The defendant, a manufacturer of women's fur garments, has pleaded not guilty to an indictment and an information charging him with violations of certain provisions of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 901 et seq., and regulations issued pursuant thereto. The indictment charges him with having violated record keeping requirements applicable to his business by virtue of maximum price regulation No. 178 issued pursuant to the Act, namely the destruction and falsification of base period records, and the submission of a false base period statement based on the falsification of records. The information charges him with demanding and obtaining illegal and excessive prices for his garments consequent upon and as an outgrowth of the alleged record falsifications. That is, that after fraudulently establishing false and unlawful maximum prices for his garments by altering his records, he then proceeded to charge such false and unlawful prices.

The question for immediate decision arises upon an application by the defendant for leave to file a complaint in the Emergency Court of Appeals setting forth objections to the validity of the Maximum Price Regulation No. 178 issued pursuant to the Act, or those provisions thereof which form directly or indirectly the basis of the indictment and information, and for an order staying the criminal pro-

ceedings until the determination of the proceedings before the Emergency Court of Appeals.

Maximum Price Regulation No. 178 was issued on July 9, 1942, to become effective on July 10, 1942. At that time the Act, Section 203(a), provided that a protest contesting the validity of a regulation had to be filed with the Administrator (from whom there is an appeal to the Emergency Court of Appeals) not later than sixty days after its issuance. No protest was filed by the defendant within the then required time.

The instant application, however, was filed pursuant to a new statutory procedure adopted in connection with the recent renewal of the Emergency Price Control Act of 1942 ("the Stabilization Extension Act of 1944," Pub.Law 383, 78th Congress, 2nd Sess.). Section 107(b) of the renewal Act, adding a new subsection, 204(e), to the original Act contains the provisions under which this application was filed. In fact it establishes two methods by which a defendant in a criminal proceeding under Section 205(b) of the Act may obtain a stay of further proceedings.

■ The first of these two methods is available only to a defendant who, prior to institution of the criminal proceeding properly filed a protest in the regular manner under Section 203 of the Price Control Act. In such a case, if the Court finds that the defendant's objections to the regulation involved, as set forth in the protest, are "made in good faith," then the defendant is entitled to a stay pending determination. This method, however, is not applicable in the present case, since the defendant did not file a protest prior to the institution of the criminal proceeding.

The second method for obtaining a stay, and the method which the defendant has invoked, provides that within thirty days after arraignment or within five days after judgment, the defendant may apply to the Court in which the criminal proceeding is pending, for leave to file in the Emergency Court of Appeals a complaint challenging the validity of the regulation alleged to have been violated. The granting of the defendant's application (Which application must, of necessity, set forth his objections to the validity of any provision which he is alleged to have violated), is conditioned upon two findings to be made by the District Court: (1) That the defendant's objections to the regulation are "made in good faith," and (2) that "there is reasonable and substantial excuse for the defendant's failure to present such objection in a protest filed in accordance with section 203(a)."

The questions then for determination here are: (1) Has the applicant set forth "objections" to the validity of the regulatory provision which he is charged with violating; (2) has he shown that his objections are "made in good faith"; and (3) has he shown that he has a "reasonable and substantial excuse" for not having presented his objections earlier under the regular statutory protest procedure?

The discussion, by way of a statement of "objections," contained in the affidavit of the defendant, is addressed to a single provision of the Regulation, namely the provision known as the "highest price line limitation." However, neither the indictment nor the information is, in reality, based upon alleged violations of the "highest price line" provision.

Maximum Price Regulation No. 178, which became effective July 10, 1942, provides that after that date no person shall sell or deliver any women's fur coats at higher prices than those established by the Regulation (Sec. 1389.151). The method of maximum pricing established by the Regulation combines the "base period" and cost-plus principles, that is, each seller's maximum legal prices are arrived at by a cost-plus computation referring back to transactions which occurred in a designated base period (Sec. 1389.153). The Regulation makes separate provision for various types of sellers such as retailers and manufacturers of which the defendant is the latter.

In order to insure that the pricing of various classes and types of fur garments sold after the effective date of the Regulation will accurately correspond to the same classes and types sold by a particular manufacturer during the base period months, which were June, July and August, 1941, the Regulation prescribes the tests to be followed in determining the proper class or type of garment (Sections 1389.153, 1389.165). A two-fold method of classifying garments is used: (1) According to "classifications," and (2) according to "categories" within such "classifications." The term "classification" refers

to the functional style or basic functional design style or basic functional design type of the garment, i. e., coats, jackets, muffs, etc. The term "category" refers to factors in the raw materials or manufacture of a garment of a particular "classification" which have customarily been regarded as constituting a basis for price differentials between garments of the same "classification", or, in other words, factors which would cause a seller to charge more money for one coat than for another, such as the species of the animal from which the pelt was taken, the manufacturing method employed and the geographical origin of the fur.

The Regulation makes separate provision for a manufacturer's maximum legal prices for (1) "categories" of garments delivered during the base period and (2) "categories" not delivered during the base period. Since the defendant claims as one of his reasons that the regulation is invalid, that it prevents him from competing with manufacturers of higher priced garments, it may be assumed that the instant case involves the latter situation, that is, the coney fur coats involved herein are made of domestic rabbit skins, whereas the only fur garments delivered by the defendant during the base period were coney coats of imported rabbit skins. In view of this "category" factor, i. e., difference in geographical origin, the coats made of domestic skins are a new "category" of fur garments not delivered by the defendant during the base period. For coats thus constituting a new "category", the Regulation (Sec. 1389.153 (a) (2)) establishes the following base period pricing formula: (1) The direct cost of the garment to the manufacturer as defined in Sec. 1389.165(12), plus (2) a designated percentage margin over cost equal to the lowest such margin established for any "category" of the same "classification" of garments in the base period, since, as previously stated, the defendant manufactured and delivered one "classification" and "category" of items exclusively during the base period, i. e., imported rabbit skin coats, the margin permitted for the new "category" (domestic rabbit skin coats) is simply that established for defendant's previous one line of coats in the base period. But the maximum legal price thus computed on the cost-plus basis for new "category" garments not sold in the base period may not be higher, in any event, than the highest price charged by the same manufacturer for any garment delivered in the base period. In other words, manufacturers were placed on notice by the Regulation that if they desired to move into the manufacture of new "categories", they would have to do so without moving into higher price lines than those delivered in the base period. This provision is generally referred to as "the highest price line limitation."

Although mention of the foregoing pricing provisions is necessary for an understanding of the issues presented by this application, yet they are not the provisions upon which the application is to be determined. Instead, the provisions of the Regulation upon which the disposition of the application must turn are the record-keeping provisions, the purpose of which is to make available the data without which a "base period" and "cost-plus" regulation of this type obviously could not operate.

The pertinent record-keeping provisions, as set forth in Section 1389.160 provide in substance that a seller of women's fur garments shall keep for inspection by the Office of Price Administration, all records which will show the maximum prices charged for each category sold during the base period and the average percentage markup over cost of each classification of women's fur garment of each kind of skin which was sold during the base period. Also that each manufacturer shall prepare and keep for inspection a statement showing each category of each classification of garments delivered during the base period and the highest price received for each; each classification of garment and each kind of skin delivered during the base period and the percentage margin received by him for each classification and each kind of skin.

The indictment is concerned exclusively with the defendant's alleged record-keeping violations and can in no way be construed as alleging any price violations. In the indictment he is charged only with the destruction and falsification of base period records and the submission of a false base period statement based on the falsification of records.

The defendant contends, however, that the record keeping provisions involved under the indictment, and the highest price line provision, are inseparably connected because, as he argues "the only possible justification which might exist for any requirement that such records be 'kept for in-

spection' is that the preservation of such records was necessary to permit adequate checking of compliance with the price line limitation rule."

But it is quite apparent that the record keeping provisions have a function and serve a purpose apart from the highest price line provision. The pricing formula applicable to this case is made up of three components, namely, the cost factor, the percentage markup, and in cases where the price resulting from the calculation of these two factors is higher than the highest price line in the base period, then the latter becomes operative as the third factor in the pricing formula. Hence it is evident that the record keeping requirements serve important purposes wholly apart from the highest price line limitation. These provisions are based upon the broad statutory authority granted to the Price Administrator under Section 2(g) ("to prevent circumvention and evasion" of price controls) and Section 202 ("Investigations; Records; Reports") of the Act. Thus the regulatory plan established by the instant regulation would be imperilled by any violation of the base period record-keeping requirements, and such violations may constitute a proper basis for criminal prosecution wholly apart from particular pricing provisions of the Regulation. In fact the invoice records which the defendant is charged with having falsified are integral records in the computation of his base period percentage markups, a matter unconnected with the highest price line factor.

It would seem, therefore, that the defendant's objections as to the highest price line limitation can in no way be viewed as being addressed to any provision of the Regulation which the defendant is alleged to have violated under the indictment.

The information herein grew solely out of the defendant's alleged violation of the record-keeping provision. That is, the pricing violations charged in the information represent the defendant's efforts to enjoy the benefits of his alleged record-falsifying activities. Notwithstanding the defendant's contentions to the contrary, he is not being charged in the information with a violation of the highest price line limitation, that is, it is not charged that he moved from one price line into another. Instead, it is charged that he falsified his true price line and thereafter proceeded to make sales on the basis of such falsi-fication. While it is true that the pricing provisions of the Regulation when taken in their entirety, including the highest price line provision, created a price ceiling structure which the defendant was forbidden to penetrate, and assuming that the defendant's efforts to obtain higher prices were in violation of these pricing provisions in their entirety, the significant point is that the defendant is charged with illegally embarking upon a course of conduct which would not bring him into direct collision with the highest price line provision, but would enable him instead to obtain higher prices than those permitted by his true base period records. In other words, it is alleged that he charged more money for his garments than his own true base period records entitled him to charge, and that he accomplished this result through falsification of his records; it being the contention of the Government that instead of attacking the highest price line limitation in a direct manner, that the defendant resorted to falsification of his records in order to create for himself a false base period price.

Therefore the defendant's "objections" to the highest price line provision are not addressed "to the validity of any provision which the defendant is alleged to have violated," either under the indictment or under the information.

The burden is, of course, also upon the defendant to show that he has a "reasonable and substantial excuse" for not having presented his objections earlier under the regular statutory procedure.

The only evidence before the Court, which purports to bear upon this requirement, is found in statements in the defendant's affidavit as follows: "This regulation was issued on July 9th, 1942 to become effective on July 10, 1942. At that time, the Emergency Price Control Act provided for the filing of protests within sixty days after the issuance of regulations. I was not aware of my right to protest this regulation until well after the sixty day period had expired. In any case, even if I had known of my right to protest, it was not until many months of operation under the regulation had gone by, that the real significance of this price line limitation and its full impact upon our operations and upon those of the industry in general became apparent to me; by which time our right to protest had long expired. With the enactment of the Stabilization Exten-

sion Act of 1944, (amending the Emergency Price Control Act) which became law on July [June] 30, 1944, our right to protest was revived. Since that time, I have been in constant consultation with my partners, my attorneys and with other interested members of the industry with a view to the institution of a protest proceeding to attack the validity of this regulation, particularly in respect to the price line limitation .rule."

His statement that he was "not aware" of his right to protest the Regulation until after the expiration of the sixty day period is not convincing in view of what has transpired. The Emergency Price Control Act had been the subject of wide-spread and constant publicity for many weeks prior to its enactment on January 30, 1942. The judicial review provisions, which included the provisions pertaining to the right of protest, were widely advertised to business circles and to the public, through the press and numerous trade journals, and it would be difficult to believe that the defendant did not have some awareness of the program and its accompanying procedures. Assuming however that he had no awareness of these facts at the time of the passage of the Act and even for some months immediately thereafter, they must have been brought forcibly to his attention at the time of the issuance of the General Maximum Price Regulation on April 28, 1942. This Regulation, which was a general "freeze" regulation, affected almost every business in the country and caused more publicity and discussion than even the Act itself. The defendant's business was subject to this Regulation and he must have known it. On July 10, 1942, Maximum Price Regulation No. 178 became effective, and the defendant claims that he did not know that there was such a thing as a statutory protest remedy until "well after" the expiration of sixty days from that date. He claims therefor that for a period of about nine months after price control was established, and for a period of about six months after his own business became subject to price control, that he did not know that there was something he could do to obtain review of the controls applicable to his business if he felt aggrieved by them. This claim would carry more weight coming from a small country merchant than it does coming from a large manufacturer in the city.

Again he states that even if he had known that he had a right of protest, that it was not until "many months" of operation under the Regulation had gone by that the real significance of this price line limitation and its full impact became apparent to him and that then his right to protest had long expired. Assuming that this could be accepted as true, and that because of changing facts and conditions in his business, or for other good reasons, he could not reasonably have known until after a period of "many months" that he was aggrieved by the highest price line provision, then the answer is that the statute as it stood prior to June 30, 1944 expressly provided for the filing of protests after the initial sixty day period upon new grounds arising after such sixty days. Sec. 203(a). This provision has been liberally construed, under the interpretation that "new grounds" are any grounds of which a person did not have prior knowledge or could not reasonably have had prior knowledge. It would appear then, that the defendant had ample opportunity to file a protest long ago on new grounds arising at the time when he claims they first arose.

Finally, he states that since the adoption of the new stay procedure and the amendment to Section 203(a) of the Act eliminating the previous sixty day time limitation, that he has "been in constant consultation with my partners, my attorneys, and with other interested members of the industry with a view to the institution of a protest proceeding."

The indictment and information were filed on August 11, 1944. If, for the period of six weeks from June 30, 1944, until August 11, 1944, the defendant had earnestly intended to file a protest, he had ample opportunity to do so. And he had additional reason to do so, particularly if he knew, as he probably did, that his activities were under scrutiny by the Government.

But instead of filing his protest, as of right he could, he sought (if the allegations in the complaining papers are well founded) to avoid the law by falsifying his accounts.

This record is not one from which I can find that he has shown "reasonable and substantial excuse" for failure to file a protest in the regular manner under Section 203 of the Emergency Price Control Act, as amended.

The foregoing conclusions make it unnecessary to give consideration to the

question as to whether or not the application complies with the statutory condition that the objections to the validity of the regulation involved shall be "made in good faith." However, if the facts upon which the indictment and information are founded, are as claimed in the brief for the Government (and they have not been disputed by the defendant), then it would appear that the application, instead of displaying the requisite good faith, displays most sharply those very factors which Congress had in view when it charged the District Courts with the responsibility of refusing a stay under the new procedure, in any, but clearly meritorious cases.

In its brief, the Government says that it will prove that the defendant destroyed, forged and falsified sales invoices and other records which by the regulation are made the basis for computing defendant's maximum legal prices; that the defendant went to Baltimore, Maryland, to one of his customers to whom he had made sales in the summer of 1941 and recovered from the customer's business records the original copies of certain sales invoices which the defendant thereafter destroyed; that the defendant arranged with a printing establishment for the printing of new sales invoice records to replace those removed by the defendant from his own books; that the newly printed invoices substituted by the defendant were carefully numbered with consecutive printed numbers to correspond with the true records removed from the defendant's books and destroyed by him; that this involved the physical dismemberment of the defendant's true and original books and records and their reconstruction after removal of the true records and the substitution of the false ones and that the defendant violated the present wartime inflation controls in a most flagrant and calculated manner.

Persons who are thus brought into Court by the Government for violation of the war time inflation control measures should not be encouraged to regard the new stay procedure as an instrument for obstruction and delay or as a means of thwarting the just processes of the law. It could not have been the intention of Congress that the new stay procedure should develop into a means of frustrating the proper enforcement of wartime price controls, nor did Congress intend that stays under the new procedure should be available indiscriminately to all defendants who might take

the trouble to file a petition setting forth mere pro forma grounds for a stay. Hence Congress surrounded the discretionary authority of the District Court in this regard with plain and strongly worded conditions as to the formulation and pertinence of "objections," and as to "good faith" challenges against the regulations, and convincing "excuse" for failure to invoke the regular statutory review procedure.

The legislative history makes it clear that Congress looked to the courts to prevent abuse of the new procedure and to insure that this procedure would operate in such a way as to give just treatment to deserving defendants, rather than in such a way as to cripple the Government's efforts to enforce these vital wartime controls.

The intent of Congress was clearly stated by Senator Wagner when he presented to the Senate the report of the Senate Conferees on the renewal Act:

"The Price Administrator has expressed great concern lest the right accorded by this procedure be abused by defendants resorting to protests and leaves to complain as a means of deferring or even avoiding the trial of criminal cases and of staying the execution of judgment in civil proceedings. But the procedure provided in the amendment does not represent a regular method to be followed in enforcement cases. Rather, it is an exceptional procedure which has been made available to avoid the risk of injustice that existed under the original act under which a defendant who had excusably failed to file a protest within the strict time limits the act allowed, might be denied any opportunity to question the validity of the regulation which he was charged with violating. The remedial procedure prescribed by the conference committee is available only to defendants whose objections the courts find have been made in good faith, and not primarily for the purpose of delay. The committee is confident that the courts will be vigilant in administering the standards of good faith to deny stays to defendants who have not previously availed themselves of the unrestricted opportunity to protest but who have been violating the regulations on the gamble that, if caught, they could then protest and secure stays of proceedings which would afford them a good chance to avoid the trial or the execution of judgment." Cong.Rec. (Senate), 78th Cong., 2d sess., June 21, 1944, p. 6451.

■ It is apparent, then, that everything points to a strict and rigidly limited use of the new stay procedure. Enforcement actions under the Price Control Act should not be subjected by the new statute to the constant hazard of an automatic stay upon mere application by a defendant. A stay application, in order to be entitled to favorable action by a court, must have more to recommend it than the natural desire of every wrongdoer to postpone legal reckoning. We have the strictly conditional terms of the statute as an explicit Congressional declaration of just what showing a defendant must make in order to recommend himself to a court under the new stay provisions, and where the defendant cannot meet these conditions clearly and substantially, it would be an abuse of authority if the application was not denied.

The defendant's application for leave to present objections against Maximum Price Regulation No. 178 in the statutory review forum, and for a stay of further proceedings in this case is denied.